UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KEVIN HUMMEL,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| J. DAVID DONAHUE, in his official | ) | |
| capacity as Commissioner of the Indiana | ) | CASE NO. 1:07-cv-1452-DFH-TAB |
| Department of Correction, and | ) | |
| WALTER E. MARTIN, in his official | ) | |
| capacity as Superintendent of Miami | ) | |
| Correctional Facility, | ) | |
| | ) | |
| Defendants. | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Kevin Hummel is an inmate at the Miami Correctional Facility in
Indiana. He is a follower of the Odinist religion, which is also known as Asatru.
See *Cutter v. Wilkinson*, 544 U.S. 709, 712 (2005) (upholding application of
RLUIPA to protect rights of adherents of the Church of Jesus Christ Christian,
Asatru, Wiccan, and Satanist religions). Hummel has sued the Commissioner of
the Indiana Department of Correction and the Superintendent of the Miami
Correctional Facility. He alleges that the Department of Correction's policy
prohibiting group worship for Odinists violates the Religious Land Use and

---

[1]Mark McPherson was also a plaintiff in this case. Plaintiff's counsel
informed the court on April 30, 2008 that McPherson was scheduled to be
released from state custody on May 1, 2008. His claim is therefore moot.

Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq.* The defendants argue that the ban on Odinist group worship is necessary to maintain safety and security in prisons.

With the consent of the parties, the court consolidated the trial on the merits with the hearing on the plaintiff's request for a preliminary injunction. See Fed. R. Civ. P. 65(a)(2). The trial took place on April 30, 2008. The court now states its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. In summary, although maintaining safety and security in prisons is a compelling governmental interest, the defendants have not met their burden of showing that a blanket ban on group worship for Odinists is the least restrictive means of furthering this interest. The court therefore is issuing a permanent injunction against enforcement of the policy prohibiting all group worship by Odinists in Indiana correctional facilities.

*Findings of Fact*

Odinism is a religion that originated thousands of years ago in Northern Europe. The modern revival of Odinism began in the early 1970s. There are groups of Odinists all over the world, including more than 100 groups in the United States. Owen Aff. Ex. 1, U.S. Department of Justice, Federal Bureau of Prisons, Inmate Religious Beliefs and Practices, Odinism/Asatru 11 (2002) [hereinafter "Inmate Religious Beliefs and Practices"]. Odinists believe in and

honor many gods and goddesses, as well as various spirits and creatures. *Id.* at 12. Odinists are expected to live according to the Nine Virtues: courage, truth, honor, fidelity, hospitality, discipline, industriousness, self-reliance, and perseverance. *Id.* at 13. Odinists use runes, which are symbols that represent energy, for meditation and healing. *Id.* at 16.

Many Odinists begin and end the day with prayers honoring gods, goddesses, and their ancestors. Some Odinists carry runes with them at all times. There are no required weekly observances for Odinists, though they will often meet to study and perform rituals. The two main Odinist rituals are called the Blot and the Sumbel. A Blot begins with the hallowing of the room and continues with the choosing of specific runes. Then the group reads a poem or verse from one of the holy books and invokes the gods and goddesses. Owen Aff. Ex. 3. Each participant takes a sip of mead or juice and toasts a god or goddess. A member of the group dips a sprig of evergreen into the bowl of juice and uses it to bless each member of the group. At this time, people can request additional blessings, for example for a sick family member or a friend in need. The group then honors the gods or goddesses with some sort of gift, which may include a sacrifice or a symbolic sacrifice. The juice is poured onto the ground (or into a cup) and the group says: "From the Gods to the Earth, to us; from us to the Earth to the Gods; a gift for a gift." Owen Aff. Ex. 3.

Immediately following the Blot, the group has a Sumbel.  A Sumbel is a celebration that involves drinking and offering toasts, boasts, oaths, stories, songs, or poems.  In the first round of a Sumbel, toasts are made in honor of gods and goddesses.  In the second round, toasts are made in honor of admired persons, living or dead.  In the final round, participants share boasts, oaths, stories, songs, or poems.  Inmate Religious Beliefs and Practices 1.  In addition to Blots and Sumbels, Odinists observe a number of holy days throughout the year, including many feasts and days of remembrance for ancestors.  *Id.* at 3.

The Indiana Department of Correction recognizes Odinism as a religion.  The Department of Correction's Handbook of Religious Beliefs and Practices states that members of this religion worship individually and as a group.  They often form local groups, called Hearths or Kindreds, which perform Blot ceremonies eight to twelve times each year.  Pl. Ex. 4 at 50.  The Handbook states that the Department of Correction prohibits group or "corporate" worship by Odinists.  Pl. Ex. 4 at 51.

Plaintiff Kevin Hummel is an inmate who is incarcerated at the Miami Correctional Facility.  He began practicing Odinism while he was incarcerated in the Indiana prison system, and he has practiced Odinism for more than two years.  When he entered the prison system, he identified himself as a Christian.  Hummel enrolled in the Purposeful Living Units Serve ("PLUS") program, a religious dormitory, where he began to study Odinism with another inmate who practiced

Odinism.  Hummel believes that his belief in and practice of Odinism have helped him control his actions and become a better person.  Before he began to practice Odinism, he identified himself as a "one-percenter," a member of a group that believes in the supremacy of the white race over all other races, but Hummel denies that he currently believes in the superiority of any race over other races. Hummel Aff. ¶ 15.  He believes that Odinism helped him realize the error of his previous beliefs.  He does not have knowledge that any of the other twenty five Odinists in the Miami facility are white supremacists.  Hummel Aff. ¶ 12.

While Hummel was enrolled in the PLUS program, prison officials permitted him to study Odinism and to practice group worship.  Hummel Aff. ¶ 13.  When he returned to the general population, however, prison officials informed him that group worship was not permitted for Odinists.   Hummel Aff. ¶¶ 10, 13.  Hummel believes that group worship and study of Odinism are necessary parts of the practice of Odinism.  He believes that Blots should be performed in a group approximately weekly and on the religion's holy days.  Hummel Aff. ¶ 11.  He believes that his practice of Odinism is substantially burdened because he is not permitted to study or worship with other Odinists or to participate in Blots.  *Id.*

On approximately July 23, 2007, Hummel filed a formal grievance with the Indiana Department of Correction requesting permission to study and/or practice Odinism in a group setting.  Hummel Aff. ¶ 18.  On August 2, 2007, his grievance was denied.  Hummel Aff. ¶ 19.  He appealed the denial of his grievance.  On

September 13, 2007, he received a response to his appeal that stated: "Asatru and Odinism are recognized by the DOC for individual practice, but are not authorized for group practice." Hummel Aff. ¶ 20. Hummel filed a complaint on November 13, 2007 alleging that the Department of Correction's policy banning group worship for Odinists violates RLUIPA. Additional facts are noted below as needed.

## Conclusions of Law

Section 3 of RLUIPA provides: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). This section of RLUIPA applies to people who are institutionalized in programs or activities that receive financial assistance from the federal government. 42 U.S.C. § 2000cc-1(b)(1). The Indiana Department of Correction receives federal funding to operate its prison system. See *Crawford v. Indiana Department of Corrections*, 115 F.3d 481, 483 (7th Cir. 1997) (noting that the Indiana prison system receives federal funds), abrogated on other grounds by *Erickson v. Board of Governors of State Colleges and Universities for Northeastern Illinois University*, 207 F.3d 945 (7th Cir. 2000).

Under RLUIPA, a plaintiff challenging a government policy or practice bears the initial burden of showing that he seeks to engage in an exercise of religion and that the challenged policy or practice substantially burdens that exercise of religion. 42 U.S.C. § 2000cc-2(b). The defendants here agree that Hummel seeks to engage in an exercise of Odinism and that the Department of Correction's ban on Odinist group worship substantially burdens his ability to exercise his religion. The defendants bear the burden of persuasion on the remaining issues: whether the Department of Correction's ban on group worship for Odinists furthers a compelling governmental interest and whether the blanket ban is the least restrictive means of furthering that compelling interest. 42 U.S.C. § 2000cc-2(b); *Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008).

I.      *Furthering a Compelling Governmental Interest*

The interest in maintaining safety and security within prisons is a compelling governmental interest, of course. *Borzych v. Frank*, 439 F.3d 388, 391 (7th Cir. 2006). The legislative history of RLUIPA shows that Congress recognized that prison inmates' rights to exercise their religions might conflict with prisons' responsibility to establish safe and secure facilities. In a joint statement introducing RLUIPA, Senators Hatch and Kennedy adopted a statement the Senate Judiciary Committee had made before passing the Religious Freedom Restoration Act ("RFRA"), a precursor to RLUIPA. The Judiciary Committee had emphasized its expectation that

the courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

146 Cong. Rec. S7775 (2000), quoting S. Rep. No. 103-111, at 10 (1993).   In accordance with this expectation, courts consistently acknowledge that they must give due deference to prison officials on issues related to safety and security within prisons.  *E.g.*, *Cutter*, 544 U.S. at 722-23 & n.11; *Koger*, 523 F.3d at 800.

Under RLUIPA, however, prison officials must do more than speculate that the accommodation of a religious practice will lead to safety and security problems.  *E.g.*, *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003) (stating that prison officials must demonstrate, not just assert, that policy is grounded in a compelling governmental interest); *Werner v. McCotter*, 49 F.3d 1476, 1480 (10th Cir. 1995) (discussing unrelated provisions in RFRA that have been superceded by RLUIPA, and stating that prison official must offer more than just a conclusory statement that policy is necessary for security or safety for court to consider the government's interest compelling); *Gordon v. Caruso*, 2007 WL 2571982, at *2 (W.D. Mich. Sept. 4, 2007) (stating that prison officials must provide some basis for their concern about security); *Campos v. Coughlin*, 854 F. Supp. 194, 207-09 (S.D.N.Y. 1994) (holding that prison officials' "speculative and uncertain anxieties" about violence did not amount to a compelling governmental interest).  When introducing RLUIPA, Senators Hatch and Kennedy also adopted

the Judiciary Committee's statement from the legislative history of RFRA: "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements." 146 Cong. Rec. S7775, quoting S. Rep. No. 103-111, at 10 (1993). Prison officials have the burden of proving not just that they have a compelling interest in safety and security of prisons, but that their policy that substantially burdens individuals' free exercise of religion furthers that interest.

Here, the defendants contend that they have banned group Odinist worship because they believe group worship would lead to violence in Indiana prisons. Dr. Hall testified through an affidavit that he had been "reliably informed" that white supremacists "are known" to claim to practice Odinism. Hall Aff. ¶ 14. One of the Odinist gods is blond-haired and blue-eyed, which makes him attractive to white supremacists. The defendants believe that these white supremacists pose a risk of dominating the true believers in Odinism and subverting their legitimate religious goals "in pursuit of racial strife and domination." Hall Aff. ¶ 15. The defendants fear that these white supremacists' actions could inflame racial tensions that are already high in Indiana prisons, leading to possible injuries to inmates and staff, and damage to property. Hall Aff. ¶ 20.

The Supreme Court has said that courts "may be expected to recognize the government's countervailing compelling interest in not facilitating inflammatory racist activity that could imperil prison security and order." *Cutter v. Wilkinson*,

544 U.S. at 723 n.11, citing *Reimann v. Murphy*, 897 F. Supp. 398, 402-03 (E.D. Wis. 1995) (concluding, under RFRA, that excluding racist literature advocating violence was the least restrictive means of furthering the compelling state interest in preventing prison violence), and *George v. Sullivan*, 896 F. Supp. 895, 898 (W.D. Wis. 1995) (same).

This court recognizes that important interest, but there are still several problems with the defendants' position.   First, the ban on group worship for Odinists burdens their ability to exercise their religion even though the prison is not concerned that true believers in Odinism pose a danger to safety and security. In *O'Bryan v. Bureau of Prisons*, the Seventh Circuit found fault under RFRA with a prison policy that restricted a specific religious practice of Wiccans based on the prison system's fear of how other inmates might react to that practice.   In the Seventh Circuit's view, the policy amounted to what is known in free speech doctrine as a heckler's veto.   349 F.3d at 401.   Defendants' policy burdening the ability of true Odinists to practice their religion out of fear of how non-Odinists might act presents essentially the same problem as the policy in *O'Bryan*.

Second, Dr. Hall testified at the trial that the Department of Correction is particularly wary of religious groups being infiltrated by people with hidden motives because someone claiming to have the key to eternal life can wield a great deal of power and authority among inmates.   Dr. Hall conceded that people with hidden motives are capable of infiltrating any group, not only Odinist groups.   The

Department of Correction permits adherents to many other religions to practice their religions as a group.

Third, and most significant, the defendants have not offered any concrete evidence that white supremacists in Indiana prisons have posed as sincere believers in Odinism or that Odinists have been responsible for any incidents of violence in Indiana prisons.  The defendants also have not offered evidence of violence by participants in Odinist group worship in prisons located in states that permit it.

The court believes that the defendants' fears are sincere, and the court recognizes that the Department of Correction faces an important and difficult task in maintaining safe and secure prisons.  However, RLUIPA requires a government that substantially burdens an inmate's free exercise of religion in the interest of safety and security to provide some basis for its policy beyond speculation about the possibility of future violence.  The defendants have failed to meet their burden to show that the ban on Odinist group worship actually furthers a compelling governmental interest.

II.    *Less Restrictive Alternatives*

Even if the defendants had supported with more specific evidence their concerns about safety and security, RLUIPA would still require them to prove that

the complete ban on Odinist group worship is the least restrictive means to ensure the safety and security of Indiana prisons.  42 U.S.C. § 2000cc-1(a).  Defendants argue that prison authorities have no sure way to distinguish between true believers and imposters.  Hall Aff. ¶ 17.  Correctional officers and other staff who are not familiar with Odinism are poorly suited to detect when group discussions stray from the true tenets of the religion into potentially dangerous matters.  Hall Aff. ¶ 18.  In response, the plaintiff has suggested at least four alternatives that would be less restrictive than a blanket ban on group worship for Odinists but would address the defendants' fears about safety and security.

A.   *Pre-approved Scripts*

The first possibility is for the Department of Correction to permit Odinist group worship if it follows a pre-approved script.  A leader within the religion could create a script that inmates would follow while being monitored by prison staff.  One potential problem with this solution is that an inmate would have to be designated as the leader of each service.  Dr. Hall testified that he prefers that a chaplain or volunteer lead religious services to ensure that the group stays "on task" and to prevent inmates from gaining power over other inmates based on their leadership positions.  However, the Department of Correction permits inmates who are Native American, Muslim, and members of the Moorish Science Temple of America to lead group worship for their faiths under the supervision of

prison staff.  Hall Dep. 41-42.  This approach may be feasible for Odinists as well.

Another potential problem with this solution could be the difficulty in creating an appropriate script.  Dr. Hall testified that the Department of Correction permits group services for adherents of the Moorish Science Temple of America using a script that was created by a non-inmate leader of the religion. Hall Dep. 42.  He testified at trial that the Moorish Science Temple of America is a structured, ceremonial religion, which made it relatively easy to create a single script for group worship.  In contrast, Odinism does not have a single sacred text or central worship service.  It is practiced in small groups called Kindreds, and the practices of two different Kindreds may differ substantially.  Dr. Hall is worried that the Department of Correction might go through the effort of devising a script only to have the inmates announce that they refuse to follow the script because it does not capture their religious practice and beliefs.  In testimony at the hearing, Dr. Hall stated with reference to pre-approved scripts:  "If they're willing to abide, we're willing to use them."  Defendants have not shown that the use of a script is not a viable alternative to a blanket ban on all group worship for Odinists.

B.    *Increased Training for Prison Staff*

A second possibility is for the Department of Correction to provide additional training for some correctional officers in Odinism, which would enable officers to

distinguish between religious and non-religious practice.  The Department of Correction fears that Odinist group worship is particularly susceptible to being subverted by dangerous elements because prison staff are not sufficiently familiar with the religion to understand its symbols or to be able to distinguish between the practice of the religion and corruption toward white supremacist ideology.  The defendants have expressed a particular concern that secret messages could be passed within the prison using runes.

Fear that the use of foreign symbols and languages could lead to safety and security breaches does not appear to be the true motivating factor behind the blanket ban on Odinist group worship.  The Department of Correction does not have a consistent policy of prohibiting the group practice of religions that use unfamiliar languages or symbols.  For example, Jews are permitted to pray in Hebrew, Muslims are permitted to pray in Arabic, and some Christians are permitted to pray in Spanish, all under the supervision of prison staff who understand only English.  Hall Dep. 114-15.  The Department has banned the group practice of only Odinism among the religions that use unfamiliar languages and symbols.

There are some indications that the ban on Odinist group worship may stem at least in part from prison officials' lack of familiarity with Odinism.  All of the chaplains employed by the Department of Correction are from Christian faiths. Hall Dep. 18-19.  The Department employs two religious service coordinators for

Muslims and one Native American religious services coordinator.  *Id.*  The Department does not currently employ anyone who is knowledgeable about Odinism.  The sum total of the training prison chaplains and staff receive regarding non-traditional religions is that they have access to the Handbook of Religious Beliefs and Practices, a short reference guide compiled by the Department about the beliefs and practices of many religions.  Hall Dep. 19-20, 113-14.

A prison's level of familiarity with a specific religion is not a permissible criterion through which to determine the rights of the members of that religion. Though the plaintiff has not asserted any claims under the United States Constitution, it is worth noting that any government policy that favors mainstream religions over non-mainstream, less familiar religions poses substantial problems under the First Amendment.  The prison could violate the Establishment Clause if its policy had the effect of advancing one religion over another without a legitimate secular reason.  See *Board of Education of Kiryas Joel Village School District v. Grumet,* 512 U.S. 687, 703 (1994); *Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005).  Similarly, RLUIPA protects members of mainstream and non-mainstream religions alike.  See *Cutter*, 544 U.S. at 712 (upholding the constitutionality of RLUIPA as applied to claims brought by inmates who were adherents of the Church of Jesus Christ Christian, Satanism, Wicca, and Odinism); *Campos*, 854 F. Supp. at 208 (finding fault with prison policy that favored traditional religions over non-traditional religions).

The "rights of inmates belonging to minority or non-traditional religions must be respected to the same degree as the rights of those belonging to larger and more traditional denominations." *Koger*, 523 F.3d at 799, quoting *Al-Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir. 1991). While fear of the strange or unknown is not uncommon, it does not justify treating members of a lesser known religion less favorably than members of any other religion. Defendants have not shown that additional training of prison staff would not be an effective way to address their concerns about safety and security.

C.    *Ceremonies Led by Volunteers*

A third possibility is for prison officials to permit pre-approved volunteers to come into the prisons to lead Odinist ceremonies. Department of Correction administrative procedures permit qualified volunteers to lead religious programs in prisons. Hall Dep. Ex. 6 at 2. The Department recently authorized group religious services for inmates who practice Wicca. In an executive directive announcing this change, the Department stated that it was attempting to locate volunteers knowledgeable in Wicca to assist with group worship services. Dr. Hall testified that the Department had approved one Odinist volunteer to be the clergy of record for a prisoner at one prison. He stated that he considered that person to be a test case for determining whether to permit Odinist volunteers to come into prisons. He indicated that if that volunteer has a positive experience, he would be willing to consider the possibility of bringing Odinist volunteers into prisons to

lead group worship services.  Regardless of whether the person is a suitable volunteer, one possibility is for the Department of Correction to make an effort to locate volunteers knowledgeable in Odinism who could lead group worship services.  Prisoners who are sincere believers would have every reason to try to help in this effort.  Defendants have not shown that this approach is not a viable alternative to their current policy.

D.    *Solutions from Other Prison Systems*

Finally, the plaintiff has presented evidence that the federal prison system and at least thirteen other state prison systems permit group worship by Odinists.  Owen Aff. ¶ 7.[2]  The fact that other prison systems permit Odinists to worship collectively is persuasive evidence that it should be possible to find a solution that effectively balances prisons' important security concerns with inmates' right to be free from substantial burdens on their free exercise of religion.  The defendants contend that there is no evidence to show that these prisons are similar in size, character, or administration to Indiana prisons.  While research into the specific solutions other prisons have found to this problem may reveal that those solutions are not appropriate for Indiana prisons, these other programs may well provide helpful guideposts for the defendants.  RLUIPA puts the burden of persuasion on

---

[2] Laurel Owen testified by affidavit that she was aware that New Jersey, Arkansas, Texas, California, Nevada, Kansas, Montana, Florida, Oregon, Michigan, Utah, Idaho, and Maryland permitted group worship for Odinists. Owen Aff. ¶ 7.  Indiana also permits inmates in religious-based dormitories to engage in group practice of Odinism.  Hummel Aff. ¶¶ 10, 13.

the defendants for this issue, 42 U.S.C. § 2000cc-2(b), and they have not shown that other prison systems' solutions are not effective.

III.     *Permanent Injunction*

A plaintiff must satisfy a four-factor test before the court can grant a permanent injunction.  The plaintiff must demonstrate:  (1) that he has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendants, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *eBAy Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

The defendants have conceded that the policy banning group worship for Odinists substantially burdens Hummel's exercise of his religion.   Though Hummel has asserted his claim under RLUIPA and not the free exercise clause of the First Amendment, the substance of his claim is that the defendants' policy burdens his right to exercise his religion freely.  See *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005) (granting preliminary injunction for plaintiff who challenged prison policy under RLUIPA based in part on irreparable injury caused by violation of rights protected by the First Amendment).  "[I]rreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion . . . ."  *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.

1996) (holding that alleged violation of RFRA was sufficient showing of irreparable harm for purpose of preliminary injunction); accord, *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001).   Thus, Hummel has demonstrated that the ban on Odinist group worship is causing him to suffer an irreparable injury.

No remedy available at law would be adequate or even available to compensate Hummel for this injury.   The balance of hardships also weighs in favor of Hummel because the defendants can further their goal of maintaining safety and security through less restrictive means, while Hummel has no other way to practice his religion with others.   The public interest would also not be disserved by a permanent injunction.   The Department of Correction should be able to maintain safe prisons while also permitting Odinists to engage in some form of group worship.   Thus, the court grants the plaintiff's motion for a permanent injunction.

The court recognizes the Department of Correction's expertise in matters concerning safety and security in prisons, so the court leaves to prison officials the task of deciding which less restrictive alternative(s) to employ.   The Department of Correction will have 60 days in which to put in place a new policy with respect to group worship for Odinists.  The Department should consider the available choices and should select the least restrictive alternative(s) that will allow Odinists the free exercise of their religion while also maintaining safe and secure prisons.  If the Department later finds specific evidence that Odinist group

worship leads to increased racial tension in the prisons, nothing in this decision should discourage the Department of Correction from taking effective steps to address safety and security concerns.

*Conclusion*

Accordingly, the court finds that the Department of Correction's policy banning all group worship for Odinists violates RLUIPA.  The defendants will have 60 days in which to put in place a new policy with respect to group worship for Odinists.  The court is issuing today a permanent injunction to take effect in 60 days.

So ordered.

Date: June 19, 2008

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org,kkendall@aclu-in.org

Betsy M. Isenberg
INDIANA STATE ATTORNEY GENERAL
Betsy.Isenberg@atg.in.gov,Jeffrey.Hunt@atg.in.gov,Annika.Brown@atg.in.gov

Thomas D. Quigley
INDIANA STATE ATTORNEY GENERAL
thomas.quigley@atg.in.gov,troyellen.daniels@atg.in.gov,tandm-q@sbcglobal.net,
brenda.mahana@atg.in.gov

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org